UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BIG RED, LLC,

　　　　　*Plaintiff-Appellant,*

　　　　v.

DAVINES S.P.A.,

　　　　　*Defendant-Appellee,*

　　　　and

RAFFCO INTERNATIONAL BEAUTY
COMPANY, LIMITED,

　　　　　*Defendant.*

No. 01-1254

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CA-99-210-7-F)

Argued: September 25, 2001

Decided: March 21, 2002

Before WILKINSON, Chief Judge, and WILKINS and
TRAXLER, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Traxler wrote the majority
opinion, in which Chief Judge Wilkinson joined. Judge Wilkins wrote
a dissenting opinion.

---

## COUNSEL

**ARGUED:** Gary Keith Shipman, SHIPMAN & ASSOCIATES,
L.L.P., Wilmington, North Carolina, for Appellant. Andrew Kent

McVey, MURCHISON, TAYLOR & GIBSON, L.L.P., Wilmington, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

TRAXLER, Circuit Judge:

Plaintiff Big Red, LLC, a North Carolina corporation engaged in the business of distributing hair and beauty products, appeals the district court's dismissal under Fed. R. Civ. P. 12(b)(6) of its unfair trade practices action, *see* N.C. Gen. Stat. § 75-1.1 (1999), against defendant Davines, SpA, a manufacturer and distributor of skin and hair care products headquartered in Parma, Italy. We affirm.

I.

This action arises out of negotiations between Big Red and Davines which, according to Big Red, were intended to grant Big Red an exclusive right to distribute Davines' hair care products within designated territories of the United States, but which never culminated in the execution of the written agreement required by North Carolina law to render such an agreement enforceable. *See* N.C. Gen. Stat. § 75-4 (1999) ("No contract or agreement . . . limiting the rights of any person to do business . . . shall be enforceable unless such agreement is in writing [and] duly signed. . . .").

On appeal, we review the district court's Rule 12(b)(6) dismissal *de novo*, *see Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997), assuming the facts alleged in the complaint are true and viewing the complaint in the light most favorable to the plaintiff, *see Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A motion to dismiss for failure to state a claim for relief should not be granted "unless it is clear that no relief could be granted under any

set of facts that could be proved consistent with the allegations." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) (internal quotation marks omitted).

According to the complaint, Davines, an Italian company, wanted to further its long-term goal of promoting and distributing its beauty products in the United States and Canada in early 1998. Big Red, which distributed beauty products in the coastal regions of North Carolina and South Carolina, was approached by Susan Budman, Davines' recently hired Director of North American Operations, about becoming the exclusive distributor of Davines' products for the southeastern United States. Negotiations ensued and included a trip by Big Red representatives to Italy to tour Davines' facility and to discuss the possibility of such a relationship. According to Big Red, these negotiations ultimately resulted in an *oral* agreement by Davines to grant exclusive distribution rights to Big Red within a designated southeastern region, as well as an agreement by Davines to devote resources towards advertising and developing the market for Big Red. In response, Big Red placed an order for Davines' products in May 1998 and began efforts to develop the market for them. However, no written agreement for such an exclusive distributorship was ever executed.

In August 1998, Big Red became concerned about Davines' alleged failure to move forward on its commitments under the arrangement, and Big Red expressed its concerns to Davines. Big Red continued, however, to devote substantial time and effort to the development of a market for Davines' products, placed a second order for Davines' products in November 1998, and began to explore with Budman the possibility of creating "sub-distributors" in order to achieve faster market penetration. In addition, and despite the continued absence of any written agreement granting Big Red an exclusive distributorship in any territory, Big Red sold its distributorship rights for other non-Davines' beauty products.

In January 1999, Davines first began exploring the idea of creating "master distributors" in the United States and Canada. Master distributors would import Davines' products at a reduced price, warehouse them, and in turn distribute them to local or regional distributors for market penetration. Budman began discussing the possibility of such

a distributorship with Big Red and, in March 1999, Big Red placed a third order for Davines' products. In April 1999, negotiations for a master distribution agreement between Big Red and Davines began in earnest, culminating in the preparation of a draft "Master Distribution Agreement" and the scheduling of face-to-face meetings on June 2-3, 1999, to discuss the proposed agreement. In anticipation of finalizing the material terms of the agreement, and in reliance upon representations made up to that point, Big Red alleges that it placed a fourth order for Davines' products on May 24, 1999, and that it leased warehouse space to store Davines' products. More specifically, Big Red alleges that in reliance upon Davines' representations and directions during the negotiation process, it entered "into a long term lease for space in Wilmington, North Carolina, in which to warehouse Davines['] product, and placed its first order, as a Master Distributor, in the approximate amount of $250,000.00, which order was to be delivered during the month of July, 1999." J.A. 19. However, no "Master Distribution Agreement" had been executed at the time.

On June 2, 1999, Big Red received a revised draft of the proposed agreement and, as scheduled, representatives of Davines and Big Red met on June 2 and June 3 to discuss the latest proposal. According to Big Red, Davines and Big Red had agreed upon *most* of the terms of the master distribution agreement by the end of the meeting on June 3, and "[t]he parties shook hands on the "'deal,'" intending to finalize it within the week. J.A. 18. But, as Big Red acknowledges, at least one sticking point remained — the parties had been unable to agree upon the applicable jurisdiction and governing law provisions in the event disputes should arise under the proposed agreement. Big Red demanded that the applicable jurisdiction and governing law be the courts and law of the United States, whereas Davines demanded, and the draft agreements reflected, that Italian law would apply and that disputes would be resolved in the courts of Parma, Italy.

Big Red alleges that shortly after the June 3, 1999 meeting, Budman told Davines that it "would have to accede to Big Red's . . . position on [the] issue" of the choice of forum and choice of law provisions, J.A. 18, prompting Davines to orally accede to Big Red's demand in this regard and to promise to provide a final written agreement executed by Davines within approximately one week. Yet, despite this alleged capitulation and the promise to send the final, exe-

cuted agreement within the week, no such final agreement was ever executed by Davines or sent to Big Red. Instead, Big Red heard "rumors" during an international trade show in Las Vegas on August 3, 1999 — two months later — that Davines was pursuing negotiations for a master distributor agreement with Graham Webb International, a large hair product manufacturer in the United States. J.A. 21.

Big Red thereafter successfully arranged another meeting with Davines' representatives on August 11, 1999, in Wilmington, North Carolina. According to the complaint, Davines' representatives traveled to Wilmington on that date "to inspect and approve the warehouse space leased by Big Red" to warehouse Davines' products, but instead "attempted to steer Big Red towards becoming [a] distributor[ ] for Davines' skin care products" only. J.A. 22. Big Red declined this opportunity and informed Davines that Big Red "intended to move forward with [its] obligations under the Master Distribution Agreement." J.A. 22. Again, no such *written* or *executed* agreement existed at the time.

Rejected in its attempts to achieve the contractual relationship that it desired, Big Red brought this action against Davines, alleging that Davines had breached both a Regional Distribution Agreement and Master Distribution Agreement with Big Red. In addition, Big Red asserted causes of action for fraud, negligent misrepresentation, and unfair and deceptive trade practices. Big Red sought actual, punitive, and treble damages, as well as injunctive relief. Davines' motion to dismiss the complaint under Rule 12(b)(6) was granted in its entirety by the district court, but Big Red now appeals only the district court's dismissal of its unfair and deceptive trade practices claim.

II.

A.

We begin our analysis of Big Red's unfair trade practices claim with a brief discussion of the district court's dismissal of Big Red's first two claims against Davines for alleged breaches of a Regional Distribution Agreement and a Master Distribution Agreement, neither of which had been reduced to writing.

N.C. Gen. Stat. § 75-4 provides that:

> No contract or agreement hereafter made, limiting the rights of any person to do business anywhere in the State of North Carolina shall be enforceable unless such agreement is in writing duly signed by the party who agrees not to enter into any such business within such territory. . . .

It is well settled that this provision applies to an agreement affording exclusive distribution rights to another. *See Radio Elec. Co. v. Radio Corp. of Am.*, 92 S.E.2d 664, 666-67 (N.C. 1956) ("[A] contract whereby a person, firm or corporation is made exclusive distributor for the State of North Carolina, precluding the manufacturer from doing business in North Carolina otherwise than through this single channel, is void unless the party so limited or restricted agrees thereto *in writing*."); *Norlin Indus., Inc. v. Music Arts, Inc.*, 313 S.E.2d 166, 169 (N.C. Ct. App. 1984) (holding that an "oral 'franchise agreement' in which the plaintiff allegedly gave [the defendant] an exclusive area in which to sell [was] barred by the statute of frauds pursuant to G.S. 75-4").

Big Red has never alleged that a Regional Distribution Agreement or Master Distribution Agreement was reduced to writing and executed by Davines. Accordingly, the purported oral "agreements," assuming they existed, were unenforceable, and the district court correctly dismissed Big Red's breach of contract claims under this statute of frauds. Big Red, for its part, has not appealed this rather clear-cut adjudication of these claims, seemingly acknowledging that it has no enforceable exclusive distributorship agreement with Davines at all, and that it therefore cannot recover the contract-based damages originally sought in this lawsuit. Instead, Big Red now asserts that it can nonetheless circumvent the statute of frauds (and achieve perhaps an even better financial result) by pursuing an action for treble damages under the North Carolina Unfair Trade Practices Act for losses it sustained in reliance upon the alleged representations made by Davines during the failed contract negotiations. We disagree.

To state a claim for unfair trade practices under the North Carolina Unfair Trade Practices Act, *see* N.C. Gen. Stat. § 75-1.1, Big Red must allege and show "(1) that the defendant committed an unfair or

deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately cause[d] actual injury to plaintiff." *Slosman v. Sonopress, Inc.*, 557 S.E.2d 176, 181 (N.C. Ct. App. 2001); *see also Computer Decisions, Inc. v. Rouse Office Mgmt. of North Carolina, Inc.*, 477 S.E.2d 262, 266 (N.C. Ct. App. 1996). The Act's "protections extend to businesses in appropriate situations," *Dalton v. Camp*, 548 S.E.2d 704, 710 (N.C. 2001), but the Act does not "apply to all wrongs in a business setting," *id.* at 711. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981). In the context of business contracts (such as that attempted here), "[i]t is well established that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action" under Section 75-1.1. *Computer Decisions*, 477 S.E.2d at 266. The plaintiff is required to allege and prove that "substantial aggravating circumstances" attended the breach. *Id.*; *see also United Roasters, Inc. v. Colgate-Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981). Indeed, in any context, some kind of "*egregious* or *aggravating* circumstances must be alleged and proved before the Act's provisions may take effect." *Dalton*, 548 S.E.2d at 711 (internal quotation marks and alterations omitted).

In this case, of course, there are no aggravating circumstances accompanying a breach of contract, because there is no enforceable contract at all. Big Red engaged in extensive negotiations with Davines with the hope that it would become an exclusive master distributor for Davines' products, and Big Red took actions in anticipation of closing the deal with Davines' blessing. At one point, the parties shook hands on the concept of the "deal," but even Big Red does not assert that a complete deal existed at the time, and certainly not a written one, as sticking points admittedly remained even at the conclusion of the June meetings to discuss the sought-after relationship. Instead of finalizing the deal with Big Red, as anticipated perhaps by even both parties at the time, Davines instead chose to pursue negotiations and reach a binding exclusive distributorship agreement with another company.

Therefore, Big Red's unfair trade practices claim rests not upon allegations of deceptive acts or practices that accompanied a breach

of an exclusive distributorship agreement, but upon allegations that Davines, during the context of negotiations for an exclusive distributorship agreement, committed an unfair or deceptive act or practice by shaking hands on the "'deal,'" J.A. 18, and "instruct[ing] Big Red to proceed with the necessary arrangements to secure space to warehouse Davines['] products in the United States," J.A. 19. As previously noted, we assume these facts to be true, *see Mylan Labs*, 7 F.3d at 1134, but "[t]he determination as to whether an act is unfair or deceptive is a question of law for the court." *Dalton*, 548 S.E.2d at 711. For the reasons that follow, we are satisfied that Big Red's allegations fall far short of establishing the "immoral, unethical, oppressive, unscrupulous," or otherwise egregious actions necessary to state a claim for unfair and deceptive trade practices under North Carolina law. *Marshall*, 276 S.E.2d at 403.

B.

To evaluate the sufficiency of Big Red's allegations of unfair and deceptive trade practices occurring during the contract negotiations process, we begin with the particularly instructive opinion in *Computer Decisions*, where the North Carolina Court of Appeals rejected an unfair trade practices claim based upon a plaintiff's similar reliance upon representations made during negotiations for a contract that also failed to result in a writing satisfying the applicable statute of frauds. *See Computer Decisions*, 477 S.E.2d at 266.

Computer Decisions sued a prospective landlord after their negotiations for leasing office space fell through. During the course of negotiating the lease agreement, which was also required to be in writing to be binding under North Carolina law, the parties reached a verbal agreement as to a number of the terms, but had not yet reduced the agreement to a final writing. Computer Decisions, under a deadline for moving, asked the prospective landlord "if they had a deal," and the landlord, "aware that [Computer Decisions] had a deadline," affirmatively responded that they indeed "'ha[d] a deal.'" *Id.* at 264. During the course of what it perceived as final negotiations to reduce the "deal" to writing, however, Computer Decisions learned that the landlord had been negotiating with another prospective tenant (with whom the landlord ultimately consummated the requisite written agreement)

and, as a result, "Computer Decisions had to locate, lease, remodel and move into new office space in 30 days." *Id.*

Computer Decisions subsequently brought suit against the landlord, alleging causes of action for breach of lease, fraud, negligent misrepresentation, and unfair and deceptive trade practices. The suit was dismissed by the trial court at the summary judgment stage, and the North Carolina Court of Appeals affirmed. Pertinent to the unfair trade practices claim, the Court of Appeals held that the prospective landlord negotiating at arms-length with Computer Decisions had no duty to inform Computer Decisions of its discussions with another prospective tenant, *see id.* at 265-66, and that the landlord was "simply exercising [its] right to contract freely with whomever [it chose]," *id.* at 266.

The allegations in the instant case are strikingly similar. Big Red seeks to hold Davines liable under the Unfair Trade Practices Act based upon representations made by Davines during arms-length negotiations that never resulted in a legally enforceable agreement, but upon which Big Red relied. Big Red was obviously disappointed by Davines' decision not to execute a final contract for an exclusive distributorship with it, but to pursue negotiations with another company instead, and Big Red was apparently harmed financially by its ill-advised decision to enter into other agreements in anticipation that the negotiations with Davines would ultimately be successful. But, like the landlord in *Computer Decisions*, Davines was exercising its "right to contract freely with whomever [it chose]" until the deal was done, *id.* at 266, and Davines had no duty to disclose to Big Red its intentions regarding the outstanding negotiations between them or that it had chosen to entertain negotiations with another prospective distributor, *see id.* at 265-66. *See also Slosman*, 557 S.E.2d at 182 (rejecting breach of contract, fraud and unfair trade practices claims where negotiations between two sophisticated parties for a commercial real estate lease, which the statute of frauds required to be in writing, fell through, even though defendant's employees had represented that a written lease would be executed and defendant had occupied premises that plaintiff had arranged for the former tenant to vacate early).

With little means to distinguish *Computer Decisions*, Big Red instead urges us to rely upon an earlier decision of the North Carolina Court of Appeals in *Process Components, Inc. v. Baltimore Aircoil Co.*, 366 S.E.2d 907 (N.C. Ct. App.), *aff'd*, 374 S.E.2d 116 (N.C. 1988) (per curiam) (table), to reach an opposite result in this case.[1] However, we view the facts in that case as distinguishable from those before us today.

In *Process Components*, the plaintiff agreed to an exclusive distribution agreement with the defendant after the defendant represented that its prior distributor was out of the subject market and that the plaintiff would in fact be the exclusive distributor for the defendant if the plaintiff agreed to the relationship. In reliance upon these representations, the plaintiff leased warehouse space, began preparations for a distributorship, and began holding itself out as a distributor. "A written contract [evidencing the exclusive distributorship] was later signed." *Id.* at 909. In actuality, the defendant was still bound by its earlier distribution agreement. When conflicts arose between the two "exclusive" distributors, the defendant breached its distribution agreement with the plaintiff by terminating their relationship and honoring the former. *See id.* at 366 S.E.2d at 911. The plaintiff then sued the defendant for breach of contract and unfair trade practices.

---

[1] With all due respect, we are unpersuaded by the argument that *Computer Decisions* is distinguishable because there was no claim that the defendant either made false statements or encouraged the plaintiff to rely on the parties' tentative agreement." In *Computer Decisions*, the defendant affirmatively reassured Computer Decisions that "[w]e have a deal," knowing that Computer Decisions "had a deadline for moving," but instead engaged in negotiations with another company for a deal to lease the premises elsewhere. *See Computer Decisions*, 477 S.E.2d at 264. The opinion also reflects that Computer Decisions was placed in a bind when the deal fell through. *See id.* The opinion does not set forth all of Computer Decisions' specific allegations in detail, but given the fact that Computer Decisions sued under the Unfair Trade Practice Act, we think it fair to assume that Computer Decisions claimed that the landlord's representation was false and intended to encourage Computer Decisions to rely upon the statement and not seek space elsewhere. Indeed, we see no other way to read it.

At trial, the jury found that the plaintiff and the defendant had an exclusive distributorship contract and that the defendant breached the contract. Based upon the jury's finding that the defendant falsely represented that its prior distributorship agreement had been terminated and that plaintiff could be its exclusive distributor, the trial court concluded that the defendant's conduct violated § 75-1.1 because it rose to the level of an unfair or deceptive trade practice. On appeal, the defendant asserted, *inter alia*, that the trial court erred in concluding that its acts, as found by the jury, constituted unfair or deceptive acts or practices under North Carolina law. The North Carolina Court of Appeals disagreed, holding that the defendant's false representations regarding its ability to enter into the exclusive distributorship agreement with the plaintiff were "unfair or deceptive acts or practices" under the Act. *Id.* at 911.[2]

Although the defendant's false representations in *Process Components* occurred in the context of contract negotiations for an exclusive distributorship, little else places that case on a footing analogous to the case before us. In *Process Components*, there was a binding, enforceable contract between the parties, a breach of that contract, and a finding that the defendant had engaged in misrepresentations

---

[2]The case of *Custom Molders, Inc. v. Roper Corp.*, 401 S.E.2d 96 (N.C. Ct. App.), *aff'd*, 410 S.E.2d 55, 55 (N.C. 1991) (per curiam) (affirming "for the reasons stated in the concurring opinion"), is similar. In *Custom Molders*, a manufacturer of plastic parts and adhesives, sued the defendant, a manufacturer of lawn mowers, for breach of contract and unfair and deceptive trade practices. The plaintiff alleged that the defendant deceitfully induced the plaintiff to meet the defendant's urgent need for the design and manufacture of a plastic footrest pad — a process that necessitated considerable up-front costs in time and money by the plaintiff — by agreeing to buy all its requirements for footpads from the plaintiff in the future so long as they were competitively priced. The following year, the defendant terminated the agreement without giving the plaintiff an opportunity to meet a competitor's lower bid, and the plaintiff sued. The court affirmed the jury's award for breach of contract and for unfair trade practices, but with regard to the latter on the narrow basis that "there was evidence from which the jury could reasonably infer that defendant represented to plaintiff that it would give plaintiff all of its footpad business for the Craftsman mower, but never intended to abide by that promise" when made. *Id.* at 101 (Wells, J. concurring).

sufficient to establish the egregious or aggravating circumstances necessary to maintain a claim for unfair or deceptive acts or practices under North Carolina precedent. In this case, in contrast, there are no such allegations of unfair or deceptive conduct that induced Big Red to enter into a contract with Davines that fell short of Big Red's expectations, or of deceptive representations or promises that were made to induce Big Red to execute a contract that Davines never had any intention of performing at the time. Rather, in a fashion more analogous to that in *Computer Decisions*, Big Red's unfair trade practices claim centers on allegations that it took actions in anticipation that it would successfully negotiate a binding exclusive distribution agreement with Davines, at least some of which were taken with Davines' explicit or implicit approval or direction, and that Big Red was ultimately harmed by the failed negotiations.

We are also unpersuaded by the argument that this case is nevertheless more closely aligned with *Process Components* than *Computer Decisions* because the existence of an enforceable agreement was wholly irrelevant to the *Process Components* court's determination that the defendant's acts constituted unfair or deceptive trade practices. The question of "whether a particular act is unfair or deceptive depends on the facts surrounding the transaction and the impact on the marketplace," *Process Components*, 366 S.E.2d at 910, and we think it proper to consider that the plaintiff in *Process Components* alleged that the unfair trade practices or acts attended the actual formation and breach of an enforceable, written agreement. Simply stated, in *Process Components*, the North Carolina Court of Appeals was not presented with the question of whether a defendant's false representations, prematurely relied upon by the plaintiff to its detriment, would have been sufficient to maintain an unfair trade practices claim had the contract negotiations ultimately *failed* to result in an enforceable, written agreement. But, in *Computer Decisions*, the North Carolina Court of Appeals *was* called upon to address the question of whether the defendant's false representation — that it intended to reduce an unenforceable oral contract into an enforceable contract — made in the context of contract negotiations that did ultimately fail, was sufficiently unfair or deceptive to maintain a claim under the Unfair Trade Practices Act. The court concluded that it was not, and we feel bound by this latter decision. *See Computer Decisions*, 477 S.E.2d at 266; *see also Slosman*, 557 S.E.2d at 182.

## C.

To conclude, we are called upon to apply North Carolina precedent in our quest to determine whether, as a matter of law, *see Dalton*, 548 S.E.2d at 711, the facts surrounding the alleged transactions and negotiations, as alleged by Big Red, are fairly characterized as ones which "offend[ ] established public policy" or are sufficiently "immoral, unethical, oppressive, [or] unscrupulous" as to be called unfair or deceptive. *Marshall*, 276 S.E.2d at 403; *see also Process Components*, 366 S.E.2d at 911. We believe, based upon controlling North Carolina statutory laws and precedent, that they are not.

First, the legislature of North Carolina has decided as a matter of public policy that certain types of contracts are of such importance that they must be in writing to be enforceable. *See Varnell v. Henry M. Milgrom, Inc.*, 337 S.E.2d 616, 619 (N.C. Ct. App. 1985) (recognizing "[t]he consistent legislative policy [in North Carolina] that business contracts be in writing to be effective"). No doubt this is because the subject matters of these types of contracts predictably generate substantial disagreements over the outcome of negotiations. The writing requirement serves to eliminate arguments to the extent practicable by demanding that the parties who have reached an agreement put the terms of that agreement in writing, thus reflecting that their discussions are finished and their negotiations over. It is the creation of this writing that the state legislature has decreed is to serve as the signal to each side that the other side has been bound and, until that point is reached, each side is on notice that a representation made — even a statement that "we have a deal" — cannot be enforced. Without that writing a party can still change its mind and refuse to be bound. Hence, the writing requirement also puts parties on notice that actions they take in reliance upon oral representations are done at their own peril. Particularly is this true where the parties, as here, are sophisticated businesses wise to commercial dealings and the requirements of the law dealing with their negotiations. As the North Carolina court has acknowledged, a statute of frauds may at times produce results that seem unfair or "overly harsh." *Id.* It may even at times "encourage false denials of otherwise valid oral agreements." *Id.* Although "[h]arsh results may occur under the Statute of Frauds, . . . the mandate of the General Assembly is clear. Were we to rule otherwise, we would encourage false assertions of . . . oral agreements.

That is precisely the result the Statute of Frauds is intended to prevent." *Id.* at 620.

Second, Big Red attempts to circumvent the normal writing requirement by alleging that Davines committed an unfair or deceptive act or practice during contract negotiations by shaking hands on the "'deal,'" J.A. 18, and "instruct[ing] Big Red to proceed with the necessary arrangements to secure space to warehouse Davines['] products in the United States," J.A. 19. But, the parties never struck a binding deal. Although a statute of frauds is not an absolute defense to all claims that might arise from actions occurring during negotiations for a contract that the law requires to be in writing to be enforceable, we are not at liberty to ignore controlling North Carolina precedent which indicates that, without more, the type of allegations leveled by Big Red are simply not enough to state a claim under the Unfair Trade Practices Act. It is unfortunate that Big Red incurred expenses in anticipation that a deal would be finalized and memorialized, but it should have known that it had not yet obtained the writing needed to bind Davines and that, until then, Davines was entitled to change its mind and to seek a better deal. Indeed, we view such actions as rather unremarkable in a competitive business setting. Allowing Big Red to bring a lawsuit based upon Davines' unenforceable promise to execute an enforceable contract would effectively eliminate the writing requirement from North Carolina law. Without more, the actions alleged by Big Red simply fall short of the "immoral, unethical, oppressive, unscrupulous," or otherwise egregious actions necessary to state a claim for unfair and deceptive trade practices under North Carolina law. *Marshall*, 276 S.E.2d at 403; *see also Slosman*, 557 S.E.2d at 182; *Computer Decisions*, 477 S.E.2d at 266.[3]

---

[3]Lest there be any confusion, we do not hold that an enforceable agreement is a prerequisite to or an element of a claim under N.C. Gen. Stat. § 75-1.1, or an absolute defense to one; it is neither. We merely hold that Big Red has failed to allege that Davines committed acts or practices that are sufficiently egregious or immoral as to state a claim under the Unfair Trade Practices Act. In reaching this conclusion, we are counseled, as we should be, by North Carolina precedent which informs us that the fact that the alleged acts or practices occurred in the context of contract negotiations for a contract that the North Carolina Legislature has decreed must be in writing is a relevant consideration in the determination of whether unfair or deceptive practices have been perpetrated by one sophisticated business upon another.

### III.

For the foregoing reasons, we hold that the alleged representations made by Davines during its contract negotiations with Big Red are insufficient to state a claim for unfair and deceptive trade practices under North Carolina law. Accordingly, the decision of the district court dismissing Big Red's unfair trade practices claim under Rule 12(b)(6) is affirmed.

*AFFIRMED*

WILKINS, Circuit Judge, dissenting:

The majority affirms the dismissal of Big Red's suit pursuant to Fed. R. Civ. P. 12(b)(6), concluding that Big Red has no claim against Davines under the North Carolina Unfair Trade Practices Act (UTPA), *see* N.C. Gen. Stat. § 75-1.1 (1999). I respectfully dissent.

### I.

The majority opinion appears to be premised on what the majority understands to be the relationship between the UTPA and traditional contract law. According to the majority, Big Red's UTPA claim represents an effort to "circumvent the statute of frauds (and achieve perhaps an even better financial result) by pursuing an action for treble damages" under § 75-1.1. *Ante* at 6. This characterization does not recognize that § 75-1.1 does more than merely authorize enhanced damages for aggravated breach of contract. Section 75-1.1 creates an independent cause of action that was specifically designed to provide relief in situations where "common law remedies had proved often ineffective." *Marshall v. Miller*, 276 S.E.2d 397, 400 (N.C. 1981); *see also id.* at 402 (rejecting notion that recovery under UTPA is limited "to cases where some recovery at common law would probably also lie"). The UTPA cause of action is "broader than traditional common law actions," *id.* at 402, and is not constrained by doctrines traditionally applied in common law breach of contract actions, *see Bernard v. Cent. Carolina Truck Sales, Inc.*, 314 S.E.2d 582, 584 (N.C. Ct. App. 1984).

The distinctive character of the UTPA is reflected in the many pre-cedents decoupling UTPA actions from breach of contract actions. Thus, on the one hand, a mere breach of contract does not give rise to a claim under § 75-1.1. *See Computer Decisions, Inc. v. Rouse Office Mgmt. of N.C., Inc.*, 477 S.E.2d 262, 266 (N.C. Ct. App. 1996). On the other hand, neither the statute itself nor the pertinent North Carolina case law requires proof of any contractual relationship between the plaintiff and the defendant. *See Prince v. Wright*, 541 S.E.2d 191, 196 (N.C. Ct. App. 2000) (noting that UTPA claims usually involve buyer-seller relationships but "courts have also recognized actions based on other types of commercial relationships, including those outside of contract."). The test applied to the defendant's acts is not whether they were proscribed by an enforceable agreement, but rather whether they "offend[ed] established public policy" or were "immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Walker v. Sloan*, 529 S.E.2d 236, 243 (N.C. Ct. App. 2000) (internal quotation marks omitted).

In light of the purposes of the UTPA and the principles enunciated by the North Carolina courts, the traditional strictures of contract law —such as the statute of frauds—should not be imported into the UTPA context. *See Marshall*, 276 S.E.2d at 400 (noting that UTPA was enacted partly because of obstacles to relief in breach of contract actions). On the contrary, regardless of whether a plaintiff has a viable breach of contract claim, the UTPA will afford a remedy if the defendant engaged in conduct such as fraud, *see Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 266 (N.C. Ct. App. 2000), *review denied*, 547 S.E.2d 13, 14 (N.C. 2001); breach of a fiduciary duty, *see id.*; intentional misrepresentations inducing reliance, *see Bernard*, 314 S.E.2d at 584; or "an inequitable assertion of [the defendant's] power or position," *see Walker*, 529 S.E.2d at 243 (internal quotation marks omitted).

Big Red's allegations, which we are bound to accept at this early stage of the litigation, unquestionably describe conduct of this nature. Big Red pled a fraud claim in its complaint, *see* J.A. 26-28, and all of the allegations supporting this claim were incorporated by reference into the UTPA claim, *see id.* at 29. In addition, the complaint alleges that Davines falsely assured Big Red that a Master Distribution Agreement would be signed and then "instructed Big Red to pro-

ceed with the necessary arrangements," *id.* at 19; Big Red responded by leasing a warehouse and ordering a large quantity of Davines products for distribution. In other words, the complaint alleges that Davines intentionally made false statements to promote its own interests, and that Big Red relied on these falsehoods to its detriment. Such behavior includes misrepresentations inducing reliance and an "inequitable assertion" of Davines' position, both of which are actionable under the UTPA.

Notwithstanding these allegations, the majority concludes that relief on Big Red's UTPA claim is barred by a provision of contract law—the statute of frauds. As noted above, however, such contract law concepts do not apply to UTPA claims.

## II.

According to the majority, two precedents—*Computer Decisions* and *Process Components, Inc. v. Baltimore Aircoil Co.*, 366 S.E.2d 907 (N.C. Ct. App.), *aff'd*, 374 S.E.2d 116 (N.C. 1988) (per curiam) —together establish that UTPA relief is unavailable to Big Red due to the absence of a binding written agreement. I believe the majority reaches this conclusion based on its importation of contract law into the UTPA context.

## A.

In *Process Components*, the defendant ("BAC") promised the plaintiff ("PROCOM") exclusive rights to distribute BAC products to certain customers; as a result of these promises, PROCOM leased a warehouse and incurred other expenses in preparation for becoming a BAC distributor. *See id.* at 909. BAC later revealed, however, that it was still bound by a previous agreement with another distributor, which prevented PROCOM from obtaining the exclusive distributorship rights that it had been promised. *See id.* The North Carolina Court of Appeals held that "[t]he evidence of [BAC's] misrepresentations clearly supports the court's conclusion that [BAC's] unfair or deceptive acts or practices caused injury to [PROCOM]." *Id.* at 911.

The same court rejected the imposition of UTPA liability in *Computer Decisions*. In that case, the plaintiff ("CDI") sought to lease

office space from the defendant ("Rouse"). *See Computer Decisions*, 477 S.E.2d at 263. After the parties orally agreed as to some but not all terms of the lease, a Rouse vice-president assured CDI's president, "We have a deal." *Id.* at 264 (internal quotation marks omitted). The parties then negotiated further and exchanged draft leases for approximately six weeks until Rouse informed CDI that it had decided to lease the space in question to another tenant. *See id.* At that point, Rouse knew that CDI had only one month left on its existing lease. *See id.* The appellate court held that CDI was not entitled to relief because it had not shown "substantial aggravating circumstances attendant to the breach" of the (unenforceable) oral lease. *Id.* at 266.

The distinction between these cases lies in the extent of the deceptions practiced by each defendant. In *Process Components*, the jury found that BAC falsely represented certain crucial facts. *See Process Components*, 366 S.E.2d at 910. The opinion in *Computer Decisions* does not indicate that CDI made comparable allegations about Rouse's conduct.*

In light of this distinction, the present case is controlled by *Process Components*, not *Computer Decisions*. Big Red specifically alleged that Davines made false representations regarding the proposed Master Distribution Agreement. Big Red further alleged that these misrepresentations were intended to induce reliance and resulted in injury to Big Red. There is no indication in *Computer Decisions* that CDI made

---

*In concluding that *Computer Decisions* is directly on point, the majority "assume[s] that [CDI] claimed that [Rouse's] representation was false and intended to encourage [CDI] to rely upon the statement and not seek space elsewhere." *Ante* at 10 n.1. In essence, the majority assumes that a failed UTPA claim was pled with all the elements of a viable UTPA claim and then bootstraps from that assumption to a redefinition of the requirements of § 75-1.1. While the majority "see[s] no other way to read" *Computer Decisions*, *id.*, I think the text supports a different interpretation: In order for a plaintiff to prevail on a UTPA claim arising from the breach of an oral lease, "substantial aggravating circumstances attendant to the breach must be shown. This the plaintiff has not done." *Computer Decisions*, 477 S.E.2d at 266 (citation omitted). In other words, CDI's claim failed because CDI did not allege aggravating circumstances such as deliberate misrepresentations or an intention to induce reliance.

similar allegations. In *Process Components*, by contrast, circumstances of this nature were proven to the jury and were deemed to support UTPA liability. This precedent compels reversal of the judgment in favor of Davines.

B.

According to the majority, the crucial distinction between *Computer Decisions* and *Process Components* is not the nature of the allegations but rather the fact that the parties in *Process Components* ultimately formed a written agreement, while the parties in *Computer Decisions* did not. Thus, the majority treats the existence of a written contract as a dispositive consideration in *Process Components*. However, in its analysis of PROCOM's UTPA claim, the North Carolina Court of Appeals did not mention or even indirectly refer to the existence of a contract. *See Process Components*, 366 S.E.2d at 910-11. This is not surprising, because the contract was created *after* the events underlying PROCOM's claim—BAC's misrepresentations and PROCOM's detrimental reliance on them. In other words, the UTPA violation was complete before any contract existed.

To hold that BAC became liable for pre-contractual misrepresentations only because a contract was subsequently formed and reduced to writing is inimical to the purposes underlying the UTPA. As discussed above, § 75-1.1 was enacted to provide relief for unscrupulous behavior that might not give rise to traditional tort or breach of contract actions. An approach that makes relief under § 75-1.1 depend on subsequent contract formation allows the scoundrels of the business world to avoid UTPA liability by simply breaking off negotiations once their deceptions have served their purpose.

Furthermore, the opinion in *Computer Decisions* does not support the majority's conclusion that the absence of a written contract precluded UTPA relief in that case. The state court held that the statute of frauds barred relief on CDI's *breach of contract* claim. *See Computer Decisions*, 477 S.E.2d at 265. As to the *UTPA* claim, however, the court expressly acknowledged that a claim under § 75-1.1 will lie when the breach of an (unenforceable) oral lease is accompanied by aggravating circumstances. *See id.* at 266. This acknowledgment contradicts the majority's implicit conclusion that a written (and therefore

enforceable) contract is a condition precedent to UTPA relief for false representations occurring during the negotiation of an agreement subject to the statute of frauds.

It is true that the *Computer Decisions* court noted the absence of an enforceable contract as one circumstance distinguishing that case from an earlier decision. *See id.* (distinguishing *Mosley & Mosley Builders, Inc. v. Landin Ltd.*, 389 S.E.2d 576 (N.C. Ct. App. 1990)). But the contract in *Mosley* was in effect *at the time of the defendant's misconduct*. *See Mosley*, 389 S.E.2d at 577-78 (describing dispute arising from conflicting interpretations of lease). Thus, neither *Computer Decisions* nor *Mosley* supports the majority's determination that contract formation *after* the defendant's deceptive acts is relevant to a UTPA claim. At most, *Computer Decisions* establishes that the existence of an enforceable written agreement at the time of a defendant's misrepresentations may assist the plaintiff in making its UTPA claim. The absence of such an agreement does not preclude relief here, however, because all the circumstances that supported UTPA liability in *Process Components*—deliberate misrepresentations and ensuing injury—are also alleged here.

For the foregoing reasons, I dissent.